UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>Scott Nason,<br><br>　　　　Debtor | Chapter 7<br>Case No. 22-10233 |
| Daniel Albert,<br><br>　　　　Plaintiff<br><br>v.<br><br>Scott Nason,<br><br>　　　　Defendant | Adversary Proceeding<br>No. 23-01001 |

## MEMORANDUM OF DECISION

　　After a roadway incident, Scott Nason punched Daniel Albert in the face. The outcome was severe: Albert was wounded and suffered grave and enduring health problems. After a lengthy and imperfect recovery, Albert obtained a state court judgment against Nason for the intentional tort of assault and battery. Albert was awarded substantial damages. Seeking to eliminate his debt to Albert and other debts, Nason soon filed a petition under chapter 7. Nason was granted a discharge, but Albert then commenced this adversary proceeding, contending that the judgment debt is excepted from discharge, under 11 U.S.C. § 523(a)(6), as a debt for a willful and malicious injury. The contents of the state court judgment substantiate that conclusion. No trial is needed here because Albert is entitled to summary judgment in his favor.

At the initial pretrial conference in this matter, the Court expressed its intention to consider, on its own initiative, issuing summary judgment in Albert's favor. *See* Fed. R. Civ. P. 56(f)(3). It was obvious that the state court judgment could dictate the result here. The Court issued an order identifying the material facts that appeared to be undisputed. The items so identified also now comprise the summary judgment record: (i) the facts alleged in Albert's complaint in this adversary proceeding that were admitted in Nason's answer and (ii) the existence and terms of the judgment entered by the Maine Superior Court in the action between Albert and Nason, along with Albert's bill of costs and interest related to that action. Copies of the judgment and bill of costs and interest were attached to Albert's complaint. Compl. Ex. 1, at 1-19 (Judgment), 20-21 (Bill).[1] As permitted, Nason filed a brief opposing summary judgment. He had the opportunity but elected not to identify any additional material facts. Albert filed a brief advocating for summary judgment.

## I.    **Background**

The state court conducted a bench trial and found the following facts. Driving separate vehicles, Albert exited I-95, and Nason soon followed. At the end of the exit ramp, Albert signaled and began to turn right. At the same time, Nason was approaching the end of the ramp to turn left toward his home nearby. There was enough space at the end of the ramp for two cars turning in opposite directions to be side by side, but Albert veered somewhat left, causing Nason to make an evasive maneuver to avoid hitting Albert's vehicle. Nason's vehicle connected with a guardrail instead. Albert was unaware of his role in the situation but observed

---

[1] The parties confirmed at the initial pretrial conference that the authenticity of the documents is undisputed. Although the state court judgment is available on Westlaw, *see* Albert v. Nason, No. CV-18-167, 2022 WL 17811313 (Me. Super. Ct. July 25, 2022), the Court will cite to various pages of the judgment appended to Albert's complaint in this action.

Nason shouting and gesturing.    Albert continued to his destination, which was essentially across the street, and he parked in the parking lot.    Meanwhile, Nason turned left, stopped to inspect his vehicle, and found damage to a front wheel and tire.    Although already critically late to medicate his ailing dog, Nason reversed course and drove to the parking lot where Albert had just parked.    Fuming about the exit ramp incident, the damage, and a perceived slight from Albert, Nason exited his vehicle.    He yelled obscenities at Albert and, at close range, swiftly swung his closed fist in an upward, forceful manner, hitting Albert in the face.    Unprepared, Albert fell to the ground and was unconscious for some time.    There was a "substantial" blood pool.    Others came to aid Albert.

Before the police arrived, Nason hightailed it out of the parking lot, went home, and hid his vehicle.    The police soon visited Nason's house to question him.    Nason claimed that his vehicle was not there, but the police discovered it.    Nason then described the guardrail incident, declared that he had punched Albert in the face and that he had taught Albert a lesson, and suggested that the police officer would have done the same thing in similar circumstances.    He intensified his self-described "confession" and other statements with profanity.    Ultimately, after pleading nolo contendere, Nason was convicted of criminal assault, prompting a 7-day jail sentence, a fine, and a restitution order.

At the emergency room after Nason hit him, Albert was diagnosed with a broken nose. Within days, however, serious blood clotting and head injury complications began to develop. Some were life threatening, and some will be lifelong.    Albert was twice hospitalized, and his general recovery took more than eight months.    His out-of-pocket medical expenses approached $100,000.    He is expected to have thousands more in future out-of-pocket expenses for

medication. He suffered both physically and mentally during his convalescence, and to some extent, will continue to suffer indefinitely.

Based on these facts, the state court reached multiple legal conclusions. It concluded that Nason committed tortious assault and battery and that this conduct caused specific long-running damage for which Nason is liable. The state court awarded Albert $366,600 in compensatory damages (past and future), as well as $10,000 in punitive damages. The state court also concluded that Nason's conduct was not negligent.

## II. Analysis

Here, in federal court, the Maine state court judgment is entitled to the same preclusive effect that it would have in Maine. *See* 28 U.S.C. § 1738; Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 80-81 (1984). Preclusion promotes judicial economy and finality in court decisions. In this proceeding, Maine's issue preclusion principle applies: factual issues determined in a final judgment cannot be relitigated by a party who already had at least the incentive and a fair opportunity to litigate them. *See* Macomber v. MacQuinn-Tweedie, 834 A.2d 131, 138-39, 140 (Me. 2003); McAlister v. Slosberg (In re Slosberg), 225 B.R. 9, 13 n.3 (Bankr. D. Me. 1998) (explaining why issue but not claim preclusion applies in nondischargeability actions).

The state court's judgment is final. Thus, issue preclusion applies when considering whether Albert is entitled to summary judgment here. Nason acknowledges the preclusive effect of the state court judgment to some degree. Yet, he fails to identify any specific genuinely disputed material fact for this Court's consideration. Likewise, he does not identify any specific factual issue that he lacked the incentive and fair opportunity to litigate in the state court proceeding. Rather, Nason suggests that the state court's factual findings, which support

its legal conclusions under state law, are insufficient to support the elements of nondischargeability under section 523(a)(6) of the Bankruptcy Code.   As explained below, Nason is incorrect.

Under section 523(a)(6), "any debt . . . for willful and malicious injury by the debtor to another [person]" is not dischargeable.   11 U.S.C. § 523(a)(6).   Although key to the inquiry, "willful and malicious injury" lacks definition in the Bankruptcy Code.   The modifiers "willful" and "malicious" are usually analyzed distinctly.   The injury must have been both.   Because these concepts involve tort law principles, particularly those of intentional torts, courts often turn to the Restatement of Torts for guidance.   *See, e.g.*, Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998); Carrillo v. Su (In re Su), 290 F.3d 1140, 1143-46 (9th Cir. 2002); Markowitz v. Campbell (In re Markowitz), 190 F.3d 455, 464-65 (6th Cir. 1999); Erickson v. Halverson (In re Halverson), 226 B.R. 22, 26-27 (Bankr. D. Minn. 1998); *see also* Restatement (Second) of Torts § 870 & cmts. a-o (articulating general principle of intentional tort liability).

A "willful" injury is one caused by a debtor's voluntary act of more than mere negligence or recklessness.   *See* Geiger, 523 U.S. at 59, 61-62, 64.   The debtor must have desired for the voluntary act to cause a harmful consequence or at least believed that the act was substantially certain to do so.   *See* In re Slosberg, 225 B.R. at 17-19 (citing Restatement (Second) of Torts § 8A & cmt. b); *see also* Geiger, 523 U.S. at 60, 61-62, 63 (citing Restatement (Second) of Torts §

5

8A).[2]   The debtor's desire or belief at the time may be established through circumstantial evidence.   Trenwick Am. Reins. Corp. v. Swasey (In re Swasey), 488 B.R. 22, 34-41 & n.14 (Bankr. D. Mass. 2013).

The common law standard applied by the state court in concluding that Nason committed the intentional tort of assault and battery is not substantially dissimilar from the willful injury standard.   In Maine, liability for tortious assault and battery flows from one's unpermitted and unprivileged deliberate physical contact with another, when such contact was intended to, or believed to be substantially certain to, cause harm or offense.   Bucci v. Essex Ins. Co., 393 F.3d 285, 297 (1st Cir. 2005) (citing Wilson v. State, 268 A.2d 484, 486-87 (Me. 1970)); Judgment at 5-6 (citing, among others, Restatement (Second) of Torts §§ 8A, 13, 18).   The alleged tortfeasor's subjective intent or belief can be determined from direct evidence such as a confession, as well as inferred from indirect evidence such as the results of the deliberate act. See Mut. Fire Ins. Co. v. Hancock, 634 A.2d 1312, 1313 (Me. 1993); Judgment at 6.

As is evident, the willful injury standard under bankruptcy law and the tortious assault and battery standard under Maine law both require a voluntary act.   They also both require intent, looking to the Restatement of Torts for its meaning.   In the Restatement, intentional

---

[2]   This intent standard is often paraphrased as requiring the debtor's *belief* to have been substantially certain.   *E.g.*, Burke v. Neronha (In re Neronha), 344 B.R. 229, 231 (Bankr. D. Mass. 2006) (citing Geiger, 523 U.S. 57); Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur), 737 F.3d 814, 818-19 (1st Cir. 2013) (citing In re Neronha, 344 B.R. at 231); Dewitt v. Stewart (In re Stewart), 948 F.3d 509, 528 (1st Cir. 2020) (citing In re Levasseur, 737 F.3d at 818).   In the Restatement, however, on which Geiger relied in explaining intent, substantial certainty relates to the *probability of the consequences of the act* rather than the degree of the actor's belief.   Restatement (Second) of Torts § 8A ("The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."); id. § 8A cmt. b ("If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result.").   The distinction might be a matter of syntax with no analytical impact, but the paraphrasing can, at times, lead litigants astray in the formulation of their arguments.

6

conduct (as differentiated from reckless and negligent conduct) occurs when the actor desires to cause specific consequences (such as harmful contact). Intentional conduct also occurs when the actor knows or believes that specific consequences (again, such as harmful contact) will result or are substantially certain to result. Restatement (Second) of Torts §§ 8A & cmt. b, 282, 500. Recognizing the possibility that the actor's testimony may lack candor due to self-interest, both standards permit reasonable inferences to be drawn from circumstantial or indirect evidence. Finally, both standards involve injury.[3]

As the state court determined, Nason committed tortious assault and battery when, angry and in striking distance of Albert, he swiftly swung his closed fist in an upward and forceful manner, hitting Albert's face. Judgment at 6-8. This act was no accident, reflex, or self-defense. Judgment at 3-4, 6-8 & nn.3-4. It was not negligent. Judgment at 16. It was deliberate and intended to cause a harmful contact with Albert. Judgment at 8.[4] Soon after,

---

[3] Courts often interchange "injury" with other words such as "harm" that, as layman's terms, may conjure up similar ideas. This can blur how "injury" is being defined because, as legal terms, the words are not necessarily synonymous. The Restatement, for example, uses "injury" "to denote the invasion of any legally protected interest of another" but uses "harm" "to denote the existence of loss or detriment in fact of any kind to a person resulting from any cause." Restatement (Second) of Torts § 7; see also id. § 7 cmt. a (contrasting "injury" and "harm"). Section 523(a)(6) uses the word "injury," without defining it, but at least one court has indicated that the Restatement's definition of "injury" applies. See Geiger v. Kawaauhau (In re Geiger), 113 F.3d 848, 852 (8th Cir. 1997) (en banc), aff'd sub nom., Kawaauhau v. Geiger, 523 U.S. 57. If definitional uncertainty about "injury" exists, it need not be resolved here. The Restatement's definition is met, as would be any other reasonably conceivable definition. Nason does not suggest otherwise.

[4] Nason makes a couple misguided arguments involving offensive contact under Maine's assault and battery standard. The state court referenced "or offensive contact" in reciting a portion of the standard. See Judgment at 5-7 (citing Restatement (Second) of Torts §§ 13, 18). The Restatement indicates that offensive contact is actionable "contact which causes no bodily harm." See Restatement (Second) of Torts § 15 cmt. a. Nason's liability was based on Albert having proved a harmful contact, not an offensive contact: "The motion and amount of force used by [Nason] not only caused 'harmful or offensive contact,' it in fact caused serious harm to [Albert]. The Court finds [Nason] committed the tort of assault and battery." Judgment at 8. This conclusion tracks with the Restatement's description of liability that arises based on harmful contact rather than offensive contact. Compare Restatement (Second) of Torts § 13 ("Battery: Harmful Contact"), with Restatement (Second) of Torts § 18 ("Battery: Offensive Contact").

Nason confessed as much, stating that he punched Albert in the face and taught him a lesson. Judgment at 7.    Beyond the confession, the nature of Nason's action was substantially certain to result in some type of bodily harm to Albert, making it possible also to infer that Nason intended such consequences.    Judgment at 6-7.    Combining these determinations with Albert having, in fact, been seriously harmed by the contact, the state court concluded that Nason was liable to Albert for tortious assault and battery.    Judgment at 8; *see also* Restatement (Second) of Torts § 13.

The facts likewise establish a willful injury under section 523(a)(6).    Nason's deliberate act of swiftly swinging his closed fist in an upward and forceful manner within striking distance of Albert's face was at least substantially certain to cause the consequence of bodily harm to Albert.    Nason may protest that he did not desire to harm Albert to any particular extent, but that protest would ring hollow and, in any event, has been foreclosed by the state court's determination.    The facts, as found by the state court after a trial, demonstrate that bodily harm to Albert was precisely the expected consequence of Nason's action.    No finding suggests that Nason did not know or believe this at the time.    Moreover, Nason's statements to the police make it reasonable to infer only that Nason actually desired for his action to cause bodily harm to Albert.    His voluntary and intentional action did cause such harm, for which he was held liable. Thus, Nason willfully injured Albert.

Nason contends that, although his action caused harm, he did not anticipate that each of Albert's medical diagnoses and complications and so on—the "injuries at issue," as he puts it— would be substantially certain to result from that action.    Thus, he generally argues, some of Albert's "injuries" were not willfully inflicted.    He made a similar argument in state court about his intent.    Here, he adds to it an insistence that the "willful" standard differs from the "intent"

8

standard that the state court applied. Nason is mistaken. Both standards consider actual intent and substantial certainty, both draw from the Restatement in doing so, and both prompt the same conclusion on these facts. Nason intended (or is deemed to have intended) that his voluntary action cause bodily harm to Albert, and it did. The harm was intentionally inflicted, not recklessly or negligently, and Nason was held liable. That constitutes a willful injury under section 523(a)(6). Nothing more specific is required. *See* supra note 3 (discussing § 523(a)(6) "injury"); *see also* Restatement (Second) of Torts § 7 (defining and distinguishing "injury" and "harm").

In effect, by arguing for a narrower approach to "injury," Nason is attempting to relitigate the state court's determination of the *scope* of his liability, which resulted in the damages portion of the debt that he wants discharged. *See* Restatement (Second) of Torts § 12A (defining "damages"). Intentional tort liability can include liability for both intended and unintended consequences. Restatement (Second) of Torts §§ 2, 435A, 435B & cmt. a.[5] Nason committed an intentional tort and was held liable for all the detriment that his conduct caused. As the state court concluded, even if Nason did not desire to harm Albert to the extent that he did, he was liable for all of it. The state court tallied the damages accordingly. These determinations are entitled to preclusive effect here, not to be revisited. The bankruptcy court's mission is to

---

[5] The Restatement's §§ 435A ("Intended Consequences") and 435B ("Unintended Consequences of Intentional Invasions") discuss the scope of liability for tortious conduct and comparatively address the scope of liability for negligent, reckless, and intentional conduct. The tort principle reflected in the Restatement's § 435B provides:

> that responsibility for harmful consequences should be carried further in the case of one who does an intentionally wrongful act than in the case of one who is merely negligent or is not at fault. . . . Its principle applies not only to permit a jury to award punitive damages, but also to cause an intentionally wrongful tortfeasor to respond for compensatory damages in cases where, were he merely negligent, he would not be required to pay damages.

Restatement (Second) of Torts § 435B cmt. a.

determine whether Nason willfully and maliciously injured Albert. If so, any debt that flows from it, including the damages debt, is nondischargeable. *See* Cohen v. de la Cruz, 523 U.S. 213, 218-21 (1998) (concluding that treble damages for fraud were nondischargeable under § 523(a)(2)(A), after determining that "any debt" and repeated "debt . . . for" phrasings in § 523(a) are meant to encompass all liability); Dean v. Clavet (In re Dean), 628 B.R. 851, 857-58 (Bankr. D. Me. 2021) (explaining Cohen's logical extended application to all liability arising from willful and malicious injury addressed in § 523(a)(6)).[6]

Having concluded that Nason willfully injured Albert, what is left to consider is whether the injury was also malicious. In the section 523(a)(6) context, "malicious" requires a "'wrongful act'" that was engaged in "'without just cause or excuse.'" In re Slosberg, 225 B.R. at 19-22 (quoting Tinker v. Colwell, 193 U.S. 473, 485-86 (1904)); *see also* Gomes v. Limieux (In re Limieux), 306 B.R. 433, 439-40 (Bankr. D. Mass. 2004). Other finer points in the standard have varied and evolved in the caselaw, including after "willful" was clarified to include the type of intent discussed above. In re Slosberg, 225 B.R. at 19-22; Jonathon S. Byington, Debtor Malice, 79 OHIO ST. L.J. 1023, 1032-36, 1045-49 (2018). There is no need to dwell here further. No particular version would alter the result.

---

[6] In his brief, Nason cites but does not discuss Eno v. McGinn (In re McGinn), 639 B.R. 1 (Bankr. D. Mass. 2022). If Nason meant to imply that his situation is comparable to that case's apportionment issue, it is not. In that case, the debtor had driven her vehicle over a particular pedestrian three times (forward, back, and forward again). Only on the third pass did the debtor proceed while knowing that she was running over a person. A state court default judgment had created a debt that covered the entire incident. The bankruptcy court concluded that only the third pass had involved willful and malicious injury and thus only the debt for that portion of the incident was nondischargeable. Lacking evidence necessary for a detailed apportionment, the bankruptcy court concluded that one-third of the total debt was nondischargeable because it could roughly correspond to harms caused by the one pass out of three that constituted a willful and malicious injury. Here, Nason's entire debt flows from his singular action, presenting no similar apportionment issue.

It is common knowledge, gained at an early age, that punching someone else in the face is generally prohibited as wrongful. The prohibition dates at least to ancient times. *See, e.g.*, Kenneth J. Vandevelde, A History of Prima Facie Tort: The Origins of a General Theory of Intentional Tort, 19 HOFSTRA L. REV. 447, 450 & n.16 (1990). Unless justifiable or otherwise excusable, society has long found such conduct to be unacceptable and punishable. *See generally* id. at 450-95. Here was no exception. Nason's justifications and excuses were all rejected. In awarding punitive damages, "to deter reprehensible conduct in society," the state court labeled Nason's conduct as "absolutely outrageous" and "egregious[.]" Judgment at 13-15 (noting that "modest" $10,000 punitive damages amount reflects factors such as Nason's ability to pay rather than seriousness of misconduct); *see also* Tuttle v. Raymond, 494 A.2d 1353, 1358-60 (Me. 1985) (clarifying purpose and propriety of punitive damages awards). Societal norms, the judgment's details, and basic logic establish that Nason's conduct was a wrongful act without just cause or excuse. Nason makes no attempt here to dispute that.

Nason urges, however, applying a standard that includes a subjective component—to consider whether he consciously disregarded his duty not to punch Albert.[7] Nason makes no claim that he was unaware of this obvious duty. He has no option to (and does not) claim a belief that his disregard of the duty was justifiable or excusable; the state court rejected his version of events on that point. Nason's new twist on events is that he might have been unaware that his act was wrongful or inexcusable because he may have been "acting in the heat of passion." Def.'s Br. 5. He cites no legal authority for this proposition, and he does not identify any facts

---

[7] To address Nason's position, the Court assumes without deciding that this subjective component could apply. *See* Byington, supra, at 1044-49 (surveying caselaw variability on whether intent continues to factor separately into "malicious" or was subsumed into "willful" through Supreme Court's clarification of that term in Geiger).

11

supporting it. He relies instead on one observation in the judgment: "Society must not tolerate someone hitting someone else in the face as a result of road rage." Judgment at 14.

Nason was angry when he punched Albert, but no facts support his contention of lacking awareness. The state court's single use of "road rage" as shorthand to describe what prompted Nason's conduct is insufficient to demonstrate a genuinely disputed material fact. *See* Fed. R. Civ. P. 56(c)(1). In state court, Nason had the opportunity and incentive to present facts on why the scope of his liability should be limited, including his liability for punitive damages. He does not contend otherwise. He would have been motivated to show why society *should* tolerate his misconduct, or at least not punish him further financially. Evidence about his mental state precluding him from knowing that he was not allowed to punch Albert would have fit into this category. If he did present such evidence, it must have been unpersuasive.[8]

With no support for Nason's heat-of-passion argument (or any argument that he lacked awareness of wrongfulness), it would be unreasonable to infer that he did not consciously disregard his duty. The state court's findings and the duty's obviousness, though, make it reasonable to infer that he did. Again, no findings suggest that Nason thought he was allowed to punch Albert. He punched him anyway and, knowing that Albert was hurt, raced away from the scene before the police arrived, hid his vehicle at his house, and then lied to the police about its whereabouts. If he had not done the last one, *maybe* his hurried exit could be explained as needing to get home to his ailing dog and *maybe* hiding his car could have been done to serve some purpose other than concealing it from the police. Taken together though, it is not reasonable to infer that these

---

[8] Nason did not ignore that his mental function could be relevant to some portion of the state court's analysis. He appears to have presented at least some evidence about his general mental health. In assessing his ability to pay punitive damages, the state court acknowledged: "[Nason] suffers from mental health issues, probably anxiety, depression, and/or PTSD." Judgment at 14. That information alone, however, does not tend to show or indicate his mental status at the key moment.

12

actions were the actions of someone who thought that his otherwise wrongful conduct was justifiable or excusable.   When his vehicle was discovered and he decided to admit what had happened, Nason offered no viable justification or excuse.   Nothing suggests that he believed that he had a valid justification or excuse then.   He ultimately offered other justifications and excuses that the state court rejected, in part, because they would have been immediately reported to the police, if credible.   There is no reasonable inference other than that Nason consciously disregarded his duty.   Thus, any subjective component to the malice inquiry has been satisfied.

Nason also raises the relevance here of the state court's conclusion that his tortious conduct was impliedly malicious due to how outrageous it was, warranting punitive damages.   He argues that such implied malice under Maine law means something different than what is meant under section 523(a)(6).   Whether and the extent to which the standards may differ need not be resolved here.   For section 523(a)(6) purposes, Nason's malicious conduct has been established above on the undisputed material facts and the only reasonable inferences drawn from those facts.

### III.   Conclusion

The ending here is as expected.   Based on the state court judgment and its preclusive effect, Nason's judgment debt (along with any costs and interest yet to be awarded) for his willful and malicious injury to Albert is nondischargeable under section 523(a)(6).[9]   Albert is entitled to judgment as a matter of law.   Summary judgment will issue accordingly.

Dated: September 8, 2023

Michael A. Fagone
United States Bankruptcy Judge
District of Maine

---

[9] In state court, Albert was successful only on his count for assault and battery, and all damages were allocated to that liability finding.